Fuchsberg, J.
The question presented on this appeal is whether, on setting aside an $18,000 jury verdict for plaintiff, on the ground of inadequacy, in an action for damages arising out of personal injuries, the trial court properly exercised its discretion in ordering a new trial on the issue of damages alone rather than on the issues of both negligence and damages.
Defendants, contending that an entirely new trial was required, argued that the verdict represented an impermissible compromise as to liability as well as damages, but the Appellate Division, Fourth Department, rejected that contention and unanimously sustained the trial court (40 AD2d 954). Upon retrial of the damages issue, this time before a Judge sitting without a jury, plaintiff received an award of $125,000, which, on plaintiff’s appeal, was modified by the Appellate Division, which increased it to $175,000. (44 AD2d 886). Our court having dismissed defendants’ motion for leave to appeal to us from the affirmance of the order granting the second trial on grounds of nonfinality (32 NY2d 686), the judgment entered after the second trial, as modified by the Appellate Division, pursuant to CPLR 5501 (subd [a], par 1), brings up for review the original order granting the new trial.
The judgment should be affirmed for the reasons that follow.
The proof of liability which the original Trial Judge had before him appears to have been considerable. On May 20, 1966, Rocco Figliomeni, then 14 years of age, had already long been a severely handicapped child. Among other things, he had but one eye, his I.Q. was 73 and, as a result of a preexisting pathological condition, the shape of his head in general, and the location of his eye in particular, were in the words of his trial counsel "distorted”, "depressed”, "indented” and "protruberant”. Because of his condition, he was enrolled at one of defendant Board of Education’s schools, in a special class for children with severe problems.
The defendant Joseph Gangemi was a teacher assigned to care for and instruct these children. The physical and athletic *181 activities the children were permitted to engage in consisted merely of skipping, jumping and playing with a small soft ball. Nevertheless, Gangemi, in the course of play with the class, threw a hard baseball to Rocco; the ball apparently struck him on the head. Gangemi had never taken the trouble to read Rocco’s available health card, which would have alerted him to the danger of exposing this child to such a potential source of injury, a fact underlined by the testimony of the school nurse. He conceded that, had he known the contents of the card, he would not have thrown the ball.
Confirmatory testimony as to defendants’ departure from appropriate safety standards also came from Lauren B. Sutherland, a highly-qualified health education expert, as well from the published safety recommendations of the State Education Department. Any serious contest on this issue was dissipated when Genevieve Doud, a teacher called as a witness in behalf of the defendant, testified that she would not have allowed Rocco to engage in a game with a hard baseball, and that it was the duty of teachers assigned to children like Rocco to protect them against themselves. Indeed, just about the only attempt at a liability defense was defendants’ rather feeble reliance on Gangemi’s assertion that, from approximately a hundred feet away, the distance that he had propelled the ball, he could only see that Rocco’s glasses fell from his face and that the ball dropped to the ground from the direction of the boy’s upraised gloved hand. Though Rocco’s own testimony, understandably in the light of his handicaps, was somewhat confused, the only other eyewitness testified that the boy was indeed struck in the head.
At the time of the occurrence, Rocco’s immediate complaints were minimal. After first attending a class, he went home. Because of the onset of drowsiness from which he could not be aroused, he was hospitalized. Among other things, tests performed at that time showed deformation of the arteries in the left frontal area of his brain. Surgical inspection by means of a craniotomy, performed by drilling burr holes through the skull, were reported to have disclosed a splintered, depressed fracture of the frontal bone. In the same area, though, the surgery also revealed fibromatosis, which the patient was known to have had long before the accident and which is characterized by bony and soft tissue tumors. About a month later, it was discovered that the surgical wound had been permitted to become infected. This required further surgery to *182 remove infected bone and left an area through which a part of the brain could be seen pulsating under a covering of skin.
Well over two years later, Rocco experienced the first of a series of episodes which have since turned out to be recurrent epileptic seizures. Before the epilepsy, Rocco had apparently enjoyed a sufficient recovery to enable him even to have taken gainful employment as "a food server or dishwasher”. However, during the later convulsive episodes, on a number of occasions he fell and struck his head, thus sustaining additional injuries. By the time of the second trial, seven years after the accident, his seizures were still unrelieved.
At common law, if a verdict was required to be set aside for inadequacy or excessiveness, a new trial on all issues was ordered (Edie v East India Co., 1 Black W 295, 298, 96 Eng Rep 166, 167; Seventeenth Annual Report of NY Judicial Council, 1954, pp 181, 192-204). In more modern practice, however, and in New York since 1951, it has come to be recognized that, where liability and damages are neither intertwined nor the result of a trade-off of a finding of liability in return for a compromise on damages, the court is empowered to limit the new trial to the issue of damages alone. (CPLR 4404; Pfeifer v Empire Merchandising Co., 33 AD2d 565; Hempel v Jenkins, 28 AD2d 1086, affd, 24 NY2d 822; Mercado v City of New York 25 AD2d 75; see, generally, New Trial as to Damages Only, Ann., 29 ALR2d 1199.)
Here, if the entire catalogue of Rocco’s medical conditions is regarded as causally connected to the incident of the hard ball striking him, it was certainly well within the discretion of the Trial Judge to set aside the $18,000 verdict for inadequacy (Crellin v Van Duzer, 269 App Div 806; Damages—Injury to Head or Neck, Ann., 11 ALR3d 370, 687), and it was for him to determine whether retrial should be on the damages issue alone. But it did not necessarily follow that, because the damages were inadequate, they were the result of an impermissible compromise or, if they were, that the compromise reached the liability issue. It is only when it can be demonstrated that an inadequate verdict could only have resulted from a compromise on the liability issue that the court must revert to the former rule requiring retrial on all issues. As we analyze the case before us, it presents a multiplicity of factors militating against any necessary conclusion that the damages’ inadequacy infected the liability determination.
Parenthetically, it should be noted that this case is not like *183 those where an amount due is fixed and certain, indeed liquidated, as in some contract actions, so that, if a party recovers at all, he must recover the full amount (Friend v Morris D. Fishman, Inc., 302 NY 389). In such cases, a compromise on the question of the underlying breach becomes self-evident. In contrast, it is the rule rather than the exception that, in cases calling for the monetary evaluation of bodily and emotional injuries and the frequently subjective pain and suffering that may flow from them, that a wide and diverse range of opinion is to be expected among triers of the fact, whether Judges or jurors. Of the latter, some may be skeptics, others stoics and still others stoical about the ability of others to endure pain. There are those too who, consciously or unconsciously, react unfavorably to the law’s measurement of such noneconomical injury in terms of dollars and cents. On the other hand, there are those who have opposite, even hypersensitive, views about the plight of injured persons. Obviously, then, whether a jury consists of a preponderance of individuals of the one stripe or the other will make a world of difference in the quantum of damages which it awards.
Interestingly, wise Trial Judges can usually gauge the character of jurors selected for a particular case and are able, with a remarkably high degree of accuracy, to predict how they will vote on specific issues in the case. Nor need confirmation wait until the outcome of the trial. To the alert observer, it often comes from facial expressions, gestures and discernable reactions to testimony long before then. The opportunity to evaluate them is one of the recognized advantages a Trial Judge has over an appellate Judge. Just as, first hand, he has seen and observed the witnesses, their personalities, their hesitancies, their tones of voice, the many other details by which people reveal themselves when under fire, he has also been afforded a similar opportunity to observe the jurors. The Trial Judge here had that opportunity and was in a position to sense whether the liability, which seems, on the record here, so clear, nevertheless appeared to present any difficulty for the jury as the proof of it unfolded in his presence, or whether it was only the damages proof to which the jury was reacting adversely. Such things are properly to be taken into account by a Trial Judge on a motion which calls as much for a judgmental determination as did this one.
Important as such general matters are, the Judge here did not have to limit himself to them. Thus, it could not have *184 been lost on him that the medical picture here was not clean-cut (see De Luca v Wells, 58 Misc 2d 878; cf. Simmons v Fish, 210 Mass 563), but beset by many practical and psychological uncertainties. Rocco’s pre-existing physically and mentally handicapped condition and his grotesque appearance could have been a cause for sympathy, but may also have served to obscure the injuries superimposed by defendant’s negligence, leaving the impression that it had made little practical difference. The complicating infection that appeared only a month after the accident, in some jurors’ minds, may have raised a question as to whether it might have been the hospital’s intervening negligence, rather than that of the Board of Education, which carried the moral burden for the plaintiff’s condition from that point forward. True, the law tells us, and the Trial Judge told the jury, that the liability of an original tort-feasor also encompasses any supervening medical malpractice which may occur in the treatment of the injuries, but it is one thing for a Judge to have so charged and another for him to consider whether damages have been fixed too parsimoniously because the jury was unhappy with the law it heard. All the more may it properly have concerned him in the framework of a situation where the 12 citizen-taxpayers on the jury had to bring in the verdict against their own local school board of education and a member of its teaching staff.
Also open to serious question was the attribution of the epilepsy to the accident. The first episode occurred after a lapse of nearly two and a half years. Plaintiff’s problems after that were attributable to it. The question as to whether it was of traumatic origin, therefore, had to be central to the damages issue. The epilepsy had not come on belatedly to a boy who had enjoyed good health before the accident, but to one who had been suffering, since long before the accident, from a condition that was causing a proliferation of cranial bony and soft tissue tumors. This was just the sort of issue on which laymen might substitute their "common sense” for an opinion expressed by plaintiff’s expert years after the event and in response to a hypothetical question. Defendants bolstered that view by more than argument. Their own medical expert suggested the convulsions need not have been traumatically induced at all. Whatever may have been the impression on the Judge, it was for the jury to make the initial decision.
On top of all this there existed the question of whether Rocco’s condition, even as first diagnosed at the hospital after *185 the accident, was causally connected to the accident at all. It is interesting to note, since we now have the benefit of the records of both trials, that, at the second one, defendants’ medical examiner, who had not been available at the first trial, testified that the X rays taken before the original craniotomy showed no fracture and that the reported fractures of the skull were the result rather than the cause of the craniotomy burr hole drilling. But we need not confine ourselves to hindsight on this matter. The Trial Judge had recognized the existence of this problem phase of the damages issue well before there was a verdict, for he charged the jury that an "issue in the case is whether or not the injury which Rocco suffered was the result of this accident on May 20, 1966.” Can it then be denied that there is sound basis for the view that, if anything troubled the jury, it was not the question of defendants’ liability, but rather the extent to which it was the competent producing cause of the plaintiff’s condition.
That any compromising, if any took place, was only on the damages phase of the trial is also borne out by the fact that, in the father’s companion case for loss of services and medical expenses, the same jury awarded him $20,000, which was somewhat in excess of the full amount of the expenses he had incurred.* On the other hand, the verdict in Rocco’s case, save for a small percentage of it which it was possible to attribute to loss of earnings, in effect was for general damages. The authorities make that clearly distinguishable from cases in which serious injuries go totally uncompensated save for relatively small, undisputed special damages. (Bradford v Edmands, 215 Cal App 2d 159, 167; see Brown v Richard H. Wacholz, Inc., 467 F2d 18; De Luca v Wells, 58 Misc 2d 878, 879, supra; Tort—Separate Trial of Issues, Ann., 85 ALR2d 9, 49; New Trial as to Damages Only, Ann., 29 ALR2d 1199; cf. Blackwelder v Service Liq. Distrs. of Cent. N. Y., 36 AD2d 678.) Further, projected damages for the cost of nursing care were not only conjectural, but ran counter to the history of the case. In seven years neither Rocco nor his parents had actually incurred any expense on that account at all.
Under these circumstances, we cannot say as a matter of law that either the Trial Judge, in deciding to set aside the *186 verdict for inadequacy, or the Appellate Division, in affirming that exercise of discretion, abused their discretion in limiting the second trial to the issue of damages alone. The original verdict, as the record reveals, was consistent with the rationale of a principled and deliberate, though inadequate, view on damages and certainly does not represent the kind of relinquishment of a conscientious conviction by some jurors on the issue of liability in return for relinquishment of such convictions by others on the issue of damages that mandates a new trial of all the issues. (4 Weinstein-Korn-Miller, NY Civ Prac, par 4404.23, p 44-69; see, also, 8 Carmody-Wait, 2d, NY Practice, § 58:8; Honigsberg v New York City Tr. Auth., 43 Misc 2d 1, 3-5.)
It should be said that the afore-mentioned considerations are, of course, directed towards this case as it was presented at the initial trial. In the second trial, limited to damages, the parties waived a jury. On the basis of the new record made there, the Appellate Division had the power to modify the judgment. (CPLR 5522.) We find no reason to disturb the modification.
Accordingly, the order appealed from should be affirmed in all respects.

 The Trial Judge did not disturb that verdict and the judgment entered thereon was affirmed on appeal.