[24 NYS3d 241]

Mark Srikishun, Appellant, v Michael Edye, M.D., et al., Defendants, and Montefiore Medical Center, Respondent.

First Department, January 19, 2016

### APPEARANCES OF COUNSEL

*Law Offices of Lawrence P. Biondi*, Garden City (*Lawrence P. Biondi* and *Lisa M. Comeau* of counsel), for appellant.

*Carroll McNulty & Kull, LLC*, New York City (*Frank J. Wenick* of counsel), for respondent.

### OPINION OF THE COURT

The order of the Supreme Court, Bronx County (Kenneth L. Thompson, J.), entered July 24, 2013, which denied plaintiff's motion to set aside the verdict of no proximate cause as to defendant Montefiore Medical Center, should be reversed, on the law and the facts and in the exercise of discretion, without costs, the motion granted, and the matter remitted for a new trial as to all issues against Montefiore.

Tom, J.P. (concurring). Because the record indicates substantial confusion among the jurors in reaching their verdict, the verdict should have been set aside pursuant to CPLR 4404 (a) and a new trial held against defendant Montefiore on liability and damages (*see e.g. Dinino v D.A.T. Constr. Corp.*, 267 AD2d 148, 149 [1st Dept 1999]).

The jury's finding that Montefiore's departure from good and accepted medical practice in allowing a knot pusher tip to remain in plaintiff's body was not a proximate cause of plaintiff's injuries was inconsistent with the jury note indicating that it believed that plaintiff should be compensated $50,000 for having to undergo a second surgery.

An examination of the record reveals that the special verdict sheet was "unclear and confusing" (*Wingate v Long Is. R.R.*, 92 AD2d 797, 798 [1st Dept 1983]), because it did not provide for an award of damages caused by the need to undergo a second surgery. The confusing and ambiguous wording of the verdict sheet caused the jurors to experience substantial confusion in reaching their verdict (*see Moore v Bohlsen Assoc.*, 141 AD2d 468, 468 [1st Dept 1988]). While "[t]he amgibuity had been brought to the attention of the Trial Justice before the jury was discharged and could have been corrected or at least clarified at that time" (*Wingate*, 92 AD2d at 798), the court did not do so and a new trial against Montefiore is required to prevent a miscarriage of justice.

KAPNICK, J. (concurring). In 2007, then 30-year-old plaintiff, Mark Srikishun, agreed to donate a kidney to his father, who had been on dialysis. During the nephrectomy (the kidney retrieval surgery), which occurred on May 17, 2007, a foreign object known as a "knot pusher tip" was left inside plaintiff's body. As a result, plaintiff was required to undergo a second surgery five days later on May 22, 2007, under general anesthesia, to remove the foreign object. Plaintiff then commenced this action against Michael Edye, M.D., the attending physician, Montefiore Medical Center, where the surgery took place, and Montefiore's employees—Raphael Tare, M.D., S. Johnson, P.A., Olga Zimlin, M.D., E. Cherune, R.N., and D. Perez, S.T.—to recover damages for the injuries he sustained, inter alia, as a result of having to undergo the second surgery.

The case proceeded to a jury trial in January 2013, during which plaintiff testified that he "went through quite of a bit of a personal trauma with the second surgery" because of the risk associated with "going under anesthesia a second time," and because when he awoke in the operating room on the table there were still tubes in his mouth, he was strapped to the table and he could not move his arms or legs. He also testified that he was in a lot of pain and discomfort, yet he was told he couldn't stay in the hospital and had to go home that same day.

On January 29, 2013 the jury rendered a unanimous verdict answering "Yes" to question No. 1 on the verdict sheet, which

asked the following: "1. Did defendant Montefiore Medical Center, through the conduct of its health care professionals including nurses and surgical technicians, depart from good and accepted medical practice by causing and permitting the knot pusher tip to be and remain in plaintiff's body following the May 17, 2007 surgery?"

However, they answered "No" to question No. 2* which asked: "2. Was this departure in allowing the knot pusher tip to remain in plaintiff's body a substantial factor in causing and/or contributing to plaintiff's injuries?"

The jury sent three notes to the court. The first note asked for a readback of some of Dr. Edye's testimony, which was read back by the court reporter. At approximately 2:00 or 2:15 p.m., the jury returned from the lunch recess, and the court indicated that it had a note from the jury, "that's note two, saying, 'We reached a verdict.'" After the clerk took the verdict, the court, in the presence of counsel and the jury stated as follows: "Let the record reflect that after a verdict was rendered, the jury sent me out a note." At the court's request, the clerk then read the note, which was written at 1:29 p.m., less than an hour prior to the verdict being taken in the courtroom. The note stated as follows: "Although we've reached a verdict, we believe that Mr. Srikishun should be compensated due to the fact that he had to undergo a second surgery, which was not included in the agreement. He should be compensated $50,000 due to the hospital's negligence."

The court proceeded immediately, without any input from counsel, to advise the jury that this third note, "which you gave to me after you rendered a verdict, is surplusage" and "has no bearing in law." In response, plaintiff's counsel stated that the note implied that the jury thought question No. 2 did not cover the damages for the second surgery, that this was an error by the jury, and that they should be given the opportunity to answer that question again. Once the jury was excused, plaintiff argued that the court should have apprised counsel of the existence of the third note and read it to them before the court took the verdict so the court, with input from counsel, could correct any errors. Specifically, plaintiff's counsel requested that the court reinstruct the jury that they should consider the second surgery as an element of damages for

---

* The jury also answered "No" to question No. 3, finding no departure on Dr. Edye's part, but that finding was not appealed.

which plaintiff could be compensated. Plaintiff's application was denied and the jury was then polled as to the verdict.

Subsequently, plaintiff moved on papers, pursuant to CPLR 4404 (a), to set aside that portion of the jury's verdict which found no proximate cause on the part of Montefiore and direct a new trial solely on the issue of damages. In support of his motion, plaintiff argued that once the jury found that defendant Montefiore was negligent, damages had to be awarded to plaintiff for having to undergo the second surgery, even if the jury didn't credit plaintiff's other theory put forth during trial that he sustained neurological injuries due to an inflammatory response associated with the retention of the knot pusher tip. Plaintiff further argued that Dr. Edye acknowledged that there would be a certain amount of pain and discomfort that necessarily goes along with the second procedure, and that plaintiff had also testified as to both the physical and mental trauma associated with the actual performance of the second procedure. According to plaintiff, counsel for defendant Montefiore conceded in her closing that damages had to be awarded to plaintiff and suggested to the jury that plaintiff should be awarded $1,000 for each minute of the 11-minute surgery. Plaintiff also argued that damages necessarily flow from the performance of a second surgery due to a retained foreign object as long as a departure is established in connection therewith, as was the case here. Finally, plaintiff argued that a trial court has the discretion to set aside a verdict which is clearly the product of substantial confusion by the jury, and that the verdict was against the weight of the evidence.

In opposition, defendant Montefiore emphasized that the jury ratified its verdict in the courtroom *after* issuing the third note. Montefiore argued that the jury clearly understood that the law allowed them to award damages to plaintiff only if they found he had proved that Montefiore's negligence was a substantial factor in causing or contributing to his injuries, which they did not. Defendant also argued that the record contained examples of plaintiff's failure to testify candidly before the jury, and disputed plaintiff's characterization of the summation as a concession that plaintiff was entitled to damages.

The court denied plaintiff's motion and this appeal ensued.

We find that the trial court erred in failing to set aside the verdict in favor of Montefiore. Under CPLR 4404 (a), a trial court has the discretion to set aside a verdict and grant a new

trial, if the verdict is clearly the product of substantial confusion among the jurors (*see Rodriguez v Baker*, 91 AD2d 143, 147 [1st Dept 1983], *affd* 61 NY2d 804 [1984]; *Batal v Associated Univs., Inc.*, 18 AD3d 484, 486 [2d Dept 2005]). Such confusion is typically demonstrated when the answers to the questions on the verdict sheet are internally inconsistent (*Batal*, 18 AD3d at 486). Here, the answer to question No. 2 on the verdict sheet is inconsistent with the third jury note, demonstrating substantial juror confusion. While this confusion could have been remedied had the note been disclosed to the attorneys prior to taking the verdict, and had the court resubmitted the issue to the jury for further deliberation after additional instructions on damages, that opportunity was missed and a new trial against Montefiore is now warranted.

While we certainly agree with our concurring colleagues (Saxe and Manzanet-Daniels, JJ.) that one of the functions of appellate review is to provide helpful guidance to the trial bench, we do not think it is necessary to go so far as to suggest the specific language to be used in the special verdict questions by the trial judge who presides over the next trial. Although we know what the case is about, the exact contents of the questions will depend on how the testimony, including evidence about the damage claims, is developed at the new trial. Therefore, the questions should not be drafted by us before the second trial even begins. Moreover, it appears to us that the trial attorneys and the trial judge will certainly be able to figure out how to reword the special verdict questions after reading our extensive discussions on the problems and confusion encountered by the jury during the first trial, as discerned from the contents of the jury notes. We believe our approach gives sufficient guidance to the trial judge and the lawyers. We disagree with the concurrence's (Saxe, J.) suggestion that this approach will "dramatically increase[ ] the possibility of yet a third trial" (concurring op of Saxe, J., at 8); rather, we believe that writing out suggested questions to place on the verdict sheet gives very little credit to the legal acumen of the trial lawyers and the trial judge who will handle this case the next time around.

In light of our determination, it is unnecessary to address plaintiff's remaining argument that the verdict was against the weight of the evidence.

Saxe, J. (concurring). In this medical malpractice action, the jury's confusion was established by contrasting the content of the jury's third note with its negative answer on the verdict sheet on the issue of Montefiore's proximate cause. It clearly, albeit incorrectly, concluded that plaintiff was only entitled to an award of damages for any physical pain he suffered as a result of defendants' negligence, and that having to undergo a second surgery to remove an item negligently left behind during the first surgery did not qualify under the available category of "pain and suffering" damages listed on the special verdict sheet. Particularly since a new trial against Montefiore is therefore necessary, the wording of the verdict sheet that likely contributed to the confusion should be reexamined to avoid such confusion in the future.

While we agree with our colleagues that a new trial against Montefiore on all issues is required, we depart from their failure to include, as we do, specific, suggested special verdict questions for inclusion on the next special verdict sheet upon retrial of this action. We believe that one of the functions of appellate review is to provide guidance to the trial bench, and that providing a step-by-step template for the retrial of this somewhat unusual case will enhance the likelihood that the next jury will reach a proper verdict. By remitting this case back for retrial with no cautionary guidance—clearly required by the confusion among the jury at the first trial—there is likely to be a replay of the prior episode of jury confusion.

The inclusion of these suggested (not mandatory) questions is designed to offer assistance to the next trial judge. The PJI special verdict questions did not help here, and the lawyers were only of modest help in assisting the trial court in framing the special verdict sheet. Our review has given us the opportunity to think about the specific problems that sowed confusion in the minds of the jury and has prompted us to clarify the needed special verdict questions in order to avoid future confusion. Our suggestion of appropriate special verdict questions should not depend on whether the trial attorneys and the trial judge are able "to figure out how to reword the special verdict questions" (concurring op of Kapnick, J., at 6). We should not be turning this process into a guessing game. At the first trial, as it turned out, the court was caused to misstep because it was not aided as it should have been by the attorneys. We have now learned from experience, and that experience should inform our decision at this point. Justice Kapnick obscures the issue by stating that the exact contents of the questions will depend on how the testimony develops during

the second trial. That is just not so. We now know exactly what the case is about and what the damages claims are.

Special verdicts are uniquely helpful as an aid to juror understanding and to avoid retrial (*Schabe v Hampton Bays Union Free School Dist.*, 103 AD2d 418, 427 [2d Dept 1984]). It is respectfully pointed out that the approach taken by Justice Kapnick dramatically increases the possibility of yet a third trial; we believe that the approach we offer here eliminates that possibility and brings finality in a way that comports with the requirements of justice.

## Facts

Plaintiff Mark Srikishun agreed to donate a kidney to his father. During the surgery to remove his kidney, the attending physician, Michael Edye, M.D., left a "knot pusher tip"—an instrument used to tie off blood vessels—inside plaintiff's body, requiring a second surgery five days later, to remove the object. Plaintiff then commenced an action against Dr. Edye, Montefiore Medical Center and various Montefiore employees.

At trial, Dr. Edye described the knot pusher tip as "about an inch and a half in length and about an eighth of an inch in diameter." He asserted that the retained knot pusher tip would not have contributed to plaintiff's postoperative pain after the kidney surgery, and that the pain plaintiff experienced was the normal result of such surgery. Plaintiff testified that he experienced "excruciating" pain after the surgery, and pain and numbness in his leg the following day. Indeed, it was based on these complaints that a CAT scan was performed, which disclosed the presence of the knot pusher tip.

The surgical procedure by which Dr. Edye removed the knot pusher tip was videotaped and shown to the jury. The surgery lasted 11 minutes and was performed under general anaesthesia. Dr. Edye asserted that plaintiff experienced no complications, and that the object had not damaged any of plaintiff's internal organs, created an abscess, or perforated any internal bodily structures. Plaintiff was sent home the same day, although according to his testimony, he was in a lot of pain and discomfort.

Plaintiff's contentions at trial regarding his damages included the claims that he sustained neurological injuries due to an inflammatory response associated with the retention of the knot pusher tip, but he also testified that he experienced pain, discomfort, distress and "personal trauma" as a result of having to undergo the second surgery and a second adminis-

tration of anaesthesia. Montefiore focused on plaintiff's lack of "permanent irreversible damage as a consequence of the second surgery" and his merely "transient numbness," and suggested that since the second surgery only lasted 11 minutes, the jury "might want to think about . . . whether compensating him for those [11] minutes at [$1,000] a minute is fair." Plaintiff objected to this measure of damages.

In instructing the jury with regard to damages, the court referred to "a sum of money which will justly and fairly compensate him for any injuries and conscious pain and suffering," and that it could "take into consideration the affect [sic] that the plaintiff's injuries have had on plaintiff's ability to enjoy life."

The verdict sheet provided to the jurors included these initial questions:

"1. Did defendant Montefiore Medical Center, through the conduct of its health care professionals including nurses and surgical technicians, depart from good and accepted medical practice by causing and permitting the knot pusher tip to be and remain in plaintiff's body following the May 17, 2007 surgery?

"___ Yes___ No

"If your answer to Question # 1 is 'NO,' please proceed to Question # 3.

"If your answer to Question # 1 is 'YES,' please proceed to Question # 2.

"2. Was this departure in allowing the knot pusher tip to remain in plaintiff's body a substantial factor in causing and/or contributing to plaintiff's injuries?

"___ Yes___ No

"Please proceed to Question # 3.

"3. Did defendant Michael Edye, M.D., depart from good and accepted medical practice by causing and permitting the knot pusher tip to be and remain in plaintiff's body following the May 17, 2007 surgery?

"___ Yes___ No

"If your answer to Question # 3 is 'NO,' and you have answered 'NO' to Question # 1 or Question # 2, Stop and report your verdict to the Court."

The jury submitted three notes to the court in the course of its deliberations. In its first note, it requested a readback of certain testimony of Dr. Edye. The second note stated that it had "reached a verdict." A third note, written at 1:29 p.m., and therefore in the court's possession before it took the verdict, read: "Although we've reached a verdict, we believe that [plaintiff] should be compensated due to the fact that he had to undergo a second surgery, which was not included in the agreement. He should be compensated $50,000 due to the hospital's negligence." After 2:00 p.m., the court took the jury verdict. The jury answered "Yes" to question 1, finding that Montefiore had departed from good and accepted medical practice by leaving the knot pusher tip in plaintiff's body following surgery, but "No" to question 2, finding that such departure was not a substantial factor in causing or contributing to plaintiff's injuries. It also answered "No" to the question of whether Dr. Edye was negligent.

Only after the verdict was rendered did the court advise the parties, in front of the jury, that the jury had sent the court the third note, but the court explained its view that this third note was surplusage once the jury had reached its verdict. Plaintiff requested that the jury be given the opportunity to reconsider question 2 because the "second surgery is part of the injuries." The court denied the request.

Plaintiff then made the underlying CPLR 4404 (a) motion to set aside the verdict of no proximate cause, which the court denied.

## Discussion

The third jury note was not surplusage; it was an illustration of the jury's essential confusion regarding what constituted a compensable injury. The jury appears to have wrongly concluded that the only type of injury that could be considered proximately caused by Montefiore's negligence must involve physical bodily injury that caused physical pain, and that therefore, absent physical suffering, plaintiff's need to undergo a second surgery could not qualify as an injury proximately caused by the negligence.

Of course, this is incorrect. A person who has to undergo a second surgery, so that a foreign object negligently left behind during the first surgery can be retrieved, may not experience any pain during or after the second procedure. However, distress, apprehension or worry could have been experienced before the second surgery, perhaps due to concerns about the

ordinary risks of any surgery or due to the individual's own concerns. In addition, surgery will by its nature be likely to have at least some physiological impact on the patient's body, even in the absence of pain; the inherent bodily intrusion may leave its mark, internally, externally, or psychologically. Such consequences, like physical pain and suffering, should also be considered proximately caused by the negligence, so that plaintiff would be entitled to an award of damages for them.

It is very likely that the terminology and framing of the court's verdict sheet contributed to the jury's confusion. First, question 2, the proximate cause question, indicated that the proven negligence must have proximately caused "injuries," which must have been understood by the jury to mean physical injuries. Then, question 6 also indicated that the type of noneconomic damages for which plaintiff was entitled to compensation was limited to his experience of "pain" and "suffering." On the contrary, however, plaintiff's noneconomic damages included more than physical bodily injury causing pain; he also claimed that the distressing necessity to undergo a second surgery, with all the risks and the bodily insult it entailed, itself constituted a compensable injury. Yet, the jury was asked to determine its award of damages only in the categories of past pain and suffering, future pain and suffering (along with the number of years), and lost earnings, without explanation of the term "pain and suffering." Although the jury did not reach that question, because it stopped with its "No" answer to questions 2 and 3, the use of the unexplained term "pain and suffering" to encompass the entire category of noneconomic damages, along with the unexplained use of the word "injuries" in question 2, could easily have contributed to the impression that plaintiff was only entitled to a damages award to the extent he felt physical pain or physically suffered.

Regardless of whether the jury reaches all the questions on a verdict sheet, the contents of those questions can have a major impact on the verdict. A verdict sheet has an extraordinary importance beyond the evidence, summations, and jury charge, because the verdict sheet is the touchstone to which the jurors repeatedly refer during the process of reaching their verdict. Scholars have argued that the narrower question formats of special verdict sheets "improve both the accuracy and the efficiency of the jury process" (Elizabeth G. Thornburg, *The Power and the Process: Instructions and the Civil Jury*, 66 Fordham L Rev 1837, 1866-1867 [Apr. 1998]). The more precise the questions, the more accurate the jury verdict will be. If the

verdict sheet obscures any of the fact issues the jury must address, there may be confusion in the resulting verdict (*see Pavlou v City of New York*, 21 AD3d 74, 77 [1st Dept 2005] [Saxe, J., dissenting], *affd on majority op* 8 NY3d 961 [2007]).

Here, the jury's confusion could have been avoided by a more particularized verdict sheet question regarding damages. Since plaintiff claimed both physical injury as a result of the second surgery, and the distress of unnecessarily having to undergo a second surgery, the verdict sheet's proximate cause question should have included a second part of question 2, such as the following:

> 2. (a) Was this departure in allowing the knot pusher tip to remain in plaintiff's body a substantial factor in causing and/or contributing to plaintiff's injuries?
>
> ___ Yes___ No
>
> Go on to Question 2 (b).
>
> (b) Was this departure in allowing the knot pusher tip to remain in plaintiff's body a substantial factor in causing and/or contributing to damages arising from the need for plaintiff to undergo the second surgery?
>
> ___ Yes___ No
>
> If you answered Yes to either Question 2 (a) or 2 (b), or both, go on to Question 3. If you answered No to both question 2 (a) and 2 (b), stop here and report back to the court.

As for the damages question, rather than directing the jury only to state the dollar amount it awarded for "[p]laintiff's past pain and suffering from the date of the accident up to your verdict," in view of the different forms of plaintiff's claimed injuries, the verdict sheet should have included a category for the amount of plaintiff's damages caused by the need to undergo a second surgery. The potential apprehension and worry, and the insult to his bodily integrity inherent in any surgery, may not constitute either "pain" or "suffering" or even "injury" as those words are commonly understood, but plaintiff is entitled to seek compensation for them as well.

It would be possible to ask the jury to award one total amount of damages for pain and suffering *and* the need to undergo a second surgery. However, in the interests of appellate review of the damages award, it would be advisable to list

them as separate categories. Question 6 would therefore look something like this:

6. What amount do you award to compensate plaintiff for:

(a) his past pain and suffering caused by the knot pusher tip having been left inside his body or caused by the surgery to remove the knot pusher tip

$_____

(b) his total future pain and suffering resulting from the knot pusher tip having been left in his body or caused by the surgery to remove the knot pusher tip

$_____

(Future pain and suffering is awarded for ___ years)

(c) damages arising from the need to undergo a second surgery to remove the knot pusher tip

$_____

(d) his lost earnings

$_____

Upon retrial, which will include the issues of proximate cause and damages, a verdict sheet approximating the foregoing form would be one way to avoid juror confusion.

TOM, J.P., concurs in a separate opinion; ANDRIAS and KAPNICK, JJ., concur in a separate opinion by KAPNICK, J.; SAXE and MANZANET-DANIELS, JJ., concur in a separate opinion by SAXE, J.

Order, Supreme Court, Bronx County, entered July 24, 2013, reversed, on the law and the facts and in the exercise of discretion, without costs, the motion granted, and the matter remitted for a new trial as to all issues against defendant Montefiore Medical Center.