678 A.2d 1060

NATHAN CONKLIN; RICHARD CONKLIN; FRANK CONKLIN, III; AUDREY CONKLIN, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF FRANKLIN CONKLIN, DECEASED, PLAINTIFFS–RESPONDENTS, v. HANNOCH WEISMAN, A PROFESSIONAL CORPORATION AND CARLETON R. KEMPH, ESQ., DEFENDANTS–APPELLANTS, AND PAULA HERTZBERG; ELLIOT LEIBOWITZ AND JOEL LEIBOWITZ, INDIVIDUALLY AND D/B/A LONGVIEW ESTATES, A NEW JERSEY GENERAL PARTNERSHIP; THEODORE D. CASSERA, P.E.; CANGER, SCHOOR AND CASSERA INC., A NEW JERSEY CORPORATION, DEFENDANTS.

Argued February 14, 1996—Decided July 18, 1996.

*Laurence B. Orloff* argued the cause for appellants (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys; *Mr. Orloff, Linda S. Moore* and *Adam K. Derman,* on the brief).

*John B. Collins* argued the cause for respondents (*Bongiovanni, Collins & Warden*, attorneys).

*Felice T. Londa* submitted a brief on behalf of *amicus curiae* New Jersey State Bar Association (*George W. Canellis*, Chairman, New Jersey State Bar Association; Amicus Committee, attorney).

The opinion of the Court was delivered by

O'HERN, J.

The primary issue in this legal malpractice action is whether plaintiffs are entitled to a new trial against their lawyer and his law firm based on the trial court's charge to the jury regarding proximate cause. In its original form, that charge would, in essence, have required defendants' negligence to have been the sole cause of the harm to the client for the attorneys to be held liable. The trial of the matter had resulted in a jury verdict of no cause for action against the defendants on the plaintiffs' major claim. Although differing as to the nature and scope of the retrial, both lower courts agreed that the charge on proximate cause contained language clearly capable of producing an unjust result and that plaintiffs were entitled to a new trial on liability. Each court, however, preserved some of the first jury's findings. We agree that plaintiffs are entitled to a new trial based on the defective jury charge below, but differ from both lower courts concerning the nature and scope of the retrial.

I

The Conklin plaintiffs are members of a farm family that settled in Montville in the 1800's. Over the years, the family diversified its activities and was, at the time of the events that led to this lawsuit, conducting, in partnership form, farm and sand and gravel operations, and had business counselors with whom it had explored the possibility of sale of the property. In the Fall of 1984, the Conklins listed for sale "100+ prime acres" of their farm. On the advice of their real estate broker, the Conklins retained the law firm of Hannoch Weisman, P.C., to represent them in the sale.

The law firm assigned a then-associate, Carleton R. Kemph, to handle the matter.

In April 1985, a buyer, Longview Estates, agreed to purchase the Conklin Farm for $12 million. The contract required the purchasers to pay $3 million in cash at or before closing. A purchase-money note and mortgage to be paid within five years after closing and bearing interest at 9 per cent represented the remaining $9 million. The Longview partners guaranteed the partnership's note.

The contract of sale, executed by the parties on May 2, 1985, described the purchase-money mortgage obligation as "subordinate" to one or more institutional construction mortgages.[1] The parties later amended the contract to subordinate the Conklin's purchase-money mortgage to a mortgage securing a loan that Longview was to obtain to raise any balance of cash due at closing.

The sale took place on December 22, 1986. By 1990, however, Longview had defaulted on its purchase-money mortgage and its construction mortgage. A mortgage lender that had priority over the Conklins by virtue of the subordination agreement contained in the contract of sale foreclosed on the property. In order to recover the land or hold onto their second mortgage, the Conklins would have had to have bid between $10 million and $12 million at the foreclosure sale to satisfy the balances due on the outstanding construction mortgage. The Conklins did not have the funds for such a buyout, not to mention that it would have made little sense to spend $12 million to recover the $9 million due to them, unless the property (with any improvements) had substantially appreciat-

---

[1] The paragraph in the contract of sale concerning the mortgage subordination obligation provided:

> The Purchase Money Mortgage will be subordinate to one or more mortgages held by an institutional lender securing a loan for all construction and development expenditures; it will also (if required by law) be subordinate to any condominium documents and reciprocal easement documents recorded in connection with the development of a condominium or townhouse project to be developed on the Premises.

ed in value. Meanwhile, Longview and its individual partners filed for bankruptcy protection. As a result of those events, the Conklins lost the $9 million owed to them under the contract of sale as well as their land.

The Conklins, believing that their attorneys had failed to protect them in this transaction, sued Hannoch Weisman and Carleton Kemph for malpractice. Plaintiffs' major claims at trial were that defendants had been negligent in preparing the contract documents and had failed adequately and accurately to explain to the Conklins the meaning and risks of subordination.

Subordination of a mortgage is an innocuous sounding expression but in the field of commercial financing it has the potential for disaster. To put the concept in simple terms, if you are a lender, to subordinate a loan to that of another means that someone else must be paid before you can collect anything from the borrower. If the borrower owes a substantial sum of money to that other party, you may not be paid at all. To protect themselves, lenders often insist on collateral, an interest in the property of the borrower that the lender can acquire if the borrower does not pay. A mortgage on real estate is perhaps the most familiar form of collateral. Again, if you are a lender, to subordinate your mortgage to the mortgage of another means that you cannot reach the collateral (the property) until that other party (holding the mortgage with priority) has been fully paid. In effect, you stand on line until all other holders of mortgages with priority have been paid.

A mortgage is thus only as good as the collateral that it secures. A $100,000.00 mortgage on a house worth $50,000.00 puts the lender at risk for $50,000.00. A $100,000.00 mortgage on the same property that is subordinated to another mortgage of $50,000.00 is really worthless unless the borrowers have other money or assets to pay the loan. As events turned out, the partnership that bought the Conklin farm did not have other money or assets sufficient to pay the loan. Assuming that the property was worth what it sold for, the Conklin's $9 million mortgage was at risk the

minute that other lenders were to be paid out of the property before the Conklins were. The more that was owed to those other preferred lenders, the more the Conklins were put at risk.[2]

At trial, the parties presented diametrically opposed positions concerning the communications between them on the subject of subordination. Plaintiffs claimed that defendants failed to provide any explanation of the meaning of subordination or the ramifications of subordination in the event of default by the buyers on any of the loans, including any attendant foreclosure. Defendants, on the other hand, asserted that on numerous occasions they provided plaintiffs with detailed explanations concerning the meaning and risks of subordination, including the effects of foreclosure and default.

Defendants emphasize that Frank Conklin, Jr., the since-deceased managing partner for the family, fully understood the meaning and consequences of subordination. Defendants point out that the Conklins' family lawyer had counseled against subordination and that the Conklins' prior negotiations with potential purchasers made the Conklins fully aware that they could not sell the farm for $12 million without allowing purchasers to obtain mortgage money to construct the housing that gives the property its value. One family member acknowledged that they had "agreed to compromise" to make the deal. Although the evidence presented by both parties at trial was thus in conflict, the jury determined by way of answers to special interrogatories that defendants were negligent in explaining subordination and the risks associated with subordination. The jury answered "Yes" to the following special interrogatory:

---

[2] In a sense the Conklins even loaned the down payment to themselves or worked for it. The contract of sale gave the purchasers a credit against the purchase price for the proceeds of the mining operations conducted on the property during the life of the contract. That came to roughly $1.5 million. The purchasers were authorized to mortgage the farm to raise the balance of the cash due at closing. The brokers received a $1.2 million commission and the Conklins, according to their brief, received roughly $50,000.00 at the closing.

Were Carleton R. Kemph and Hannoch Weisman negligent in representing the Conklin Farm partnership in connection with explaining subordination and the risks associated with subordination?

However, the jury answered "No" to the next interrogatory:

Was the negligence of Carleton R. Kemph and Hannoch Weisman a proximate cause of damage suffered by the Conklin Farm partnership?

In addition, the jury found that defendants were not negligent in drafting the contract documents insofar as they concerned subordination.[3]

Plaintiffs moved for judgment notwithstanding the verdict or for a new trial on the subordination issue. After reviewing the filings and hearing oral argument, the trial court concluded that a paragraph in its charge may have misled the jury. That paragraph read as follows:

Thus, for example, if you as jurors find that the proximate cause of plaintiffs' alleged losses was the bankruptcy of Longview Estates [and its principals], then you may not find Kemph liable for malpractice because his acts and omissions, even if you conclude they were deviations from accepted standards of practice, were not the proximate cause of the plaintiffs' losses.

The court found that the paragraph could have misled the jury to believe that defendants' malpractice could not be considered a proximate cause of plaintiffs' losses if those losses were also caused by the bankruptcy of Longview Estates and its partners.

The court further concluded that a second paragraph in the charge, which the court added just before the jury began its deliberations, failed to overcome the misleading effect of the original charge. That paragraph read:

However, the defendant is not relieved from liability for his negligence by the intervention of acts of third persons if those acts were reasonably foreseeable, such as the occurrence of the default, foreclosure and bankruptcy and the defendant failed to advise about the possibility of same. Neither is the defendant relieved from liability by the intervening acts of third persons where his own prior negligence was an efficient cause of the damage.

---

[3] The jury did find that the defendants were negligent concerning the handling of a disputed triangular piece of property and a road-widening issue and awarded damages for that negligence. Those issues are not before us.

Because the trial court determined that its misleading jury charge "resulted in a verdict which clearly constituted a miscarriage of justice under the law," the court granted plaintiffs' motion for a new trial on the negligent advice/subordination issue.

Concerning the nature and scope of the retrial, the court determined that, based on the diametrically opposed evidence offered at trial, the court could fairly infer that the jury had accepted plaintiffs' version of the facts concerning subordination and had rejected defendants' version. Accordingly, the court preserved the verdict establishing defendants' negligence and ordered the jury on retrial to determine proximate cause, comparative negligence and damages based on plaintiffs' version of the facts, that is, that defendants had not advised them of the risks of subordination. (The jury had not reached the related issues of comparative negligence and damages at the first trial because it found no proximate cause between defendants' negligence and plaintiffs' damages.)

The Appellate Division agreed with the trial court that the jury charge was defective and that the trial court's insertion of a separate paragraph on the issue of intervening causation did not overcome the defect. The Appellate Division explained that "[i]n the absence of an express statement to the jury that the original charge was incorrect, the additional charge merely left the jury with unresolved conflicting instructions of the law in the critical portion of the charge that relates difficult abstract concepts to the facts of the case." 281 *N.J.Super.* 448, 454, 658 *A.*2d 322 (1995).

Although the Appellate Division agreed with the trial court's conclusion that the defective jury charge required a new trial, the court disagreed with the trial court's disposition concerning the nature and scope of the retrial. The Appellate Division first instructed the court on retrial to exclude proximate cause from its charge to the jury (except as a factor in assessing damages if the jury found defendant to be liable) and instead to employ an objective cause-in-fact analysis similar to that used in medical malpractice "informed consent" cases, in which a court asks the

jury to decide whether a prudent patient would have declined to undergo the medical treatment if adequately informed of its risks. Under that rationale, when an attorney provides inadequate or inaccurate advice, the jury should be asked whether a prudent client would have declined to enter into the transaction if adequately informed of its risks.

The Appellate Division further held that, although that objective standard would suffice in most legal malpractice cases, this case also required the application of a limited "subjective" standard. Under the subjective standard of causation, a jury is asked to determine not whether a prudent plaintiff would have entered the disputed transaction, but rather whether the plaintiff in the case would have entered the transaction if adequately informed of its risks. The court determined that a subjective analysis was appropriate in this case because, based on uncontested evidence of statements of certain plaintiffs to defendants prior to the sale of the Conklins' land, a jury could determine without relying solely on uncorroborated hindsight that plaintiffs would not have sold their property if advised of the risks of subordination.

In earlier negotiations with another purchaser concerning a joint venture, defendants acknowledged that their clients did not want to entertain any "risk quotient." Accordingly, the Appellate Division held that at the retrial, in addition to making an objective analysis of what a prudent seller would have done, the jury should be instructed to answer the following question: "[R]egardless of what a prudent seller would have done, would *these* plaintiffs have declined to sell rather than undertake the risks of subordination." *Id.* at 455, 658 A.2d 322.

On the scope of the retrial, the Appellate Division affirmed the trial court's ruling that preserved the jury's finding of defendants' negligence. The Appellate Division agreed with the trial court that the jury's finding of negligence at trial turned on whether the jury accepted plaintiffs' or defendants' version of the facts concerning subordination and that those facts were separable from the issue of causation. "The jury's rejection of defendant[s']

evidence [was] entirely distinct and separable from the issue of causation, particularly in light of our reduction of that issue to causation in fact rather than proximate cause." *Id.* at 457, 658 *A.*2d 322.

In addition, the Appellate Division removed the issue of plaintiffs' comparative negligence from the retrial. The court believed that the jury's factual finding that defendants were negligent subsumed the issue of plaintiffs' comparative negligence. It declared: "Plaintiffs cannot be found negligent for failing to understand [or inquire about] the *meaning and risks of subordination* where the jury has found that defendant negligently failed to provide an explanation that would have given them that understanding." *Id.* at 458, 658 *A.*2d 322. Rather than to allow another trial with those issues in dispute, we granted defendants' motion for leave to appeal. 142 *N.J.* 510, 665 *A.*2d 1104 (1995).

## II

It is indeed unfortunate that an eleven week jury trial has been substantially set aside because of a single paragraph contained in a sixty-seven page jury charge. However, "An appellate court should give considerable deference to a trial court's decision to order a new trial, as the trial court has gained a 'feel of the case' through the long days of the trial." *Lanzet v. Greenberg,* 126 *N.J.* 168, 175, 594 *A.*2d 1309 (1991). The standard for ordering a retrial of issues of fact is "vastly different" from the standard for resolving issues of fact. *Ibid.* The trial court could reasonably conclude that the paragraph at issue effectively directed a verdict in favor of defendants on the issue of proximate cause and was thus "clearly capable of producing an unjust result. . . ." *Gaido v. Weiser,* 227 *N.J.Super.* 175, 198, 545 *A.*2d 1350 (App.Div. 1988), *aff'd,* 115 *N.J.* 310, 558 *A.*2d 845 (1989).[4]

---

[4] Because we affirm the trial court's discretionary decision to grant a new trial, it is not critical that we decide the parties' dispute over the issue of whether

The disputed paragraph had the potential in the trial court's view to prohibit the jury from finding that defendants' negligence was a proximate cause of plaintiffs' alleged losses if the jury concluded that the intervening bankruptcy of Longview Estates and its partners was also a proximate cause of those losses. "The charge permitted, if not compelled, a finding that the [bankruptcy of Longview] constituted an independent intervening cause which absolved defendants, even if negligent, from responsibility for the effects of the [bankruptcy]." *Ellis v. Caprice*, 96 *N.J.Super.* 539, 547–48, 233 *A*.2d 654 (App.Div.), *certif. denied*, 50 *N.J.* 409, 235 *A*.2d 901 (1967) (reversing jury verdict in favor of defendant on issue of proximate cause when trial court commented that doctrine of intervening cause was not applicable to case "because no one could reasonably foresee [a third party's negligence]"). The trial court could reasonably conclude that the jury below had no choice, had it followed the charge as originally written, but to find in favor of defendants on the issue of proximate cause.

The defective portion of the charge also incorrectly stated that plaintiffs were required to establish that defendants' negligence was *the* proximate cause of plaintiffs' losses when in fact and law there may be any number of proximate causes of a given result. The trial court in *Ellis, supra*, similarly charged the jury that the plaintiffs were required to establish that the defendants' negligence was *the* proximate cause of the plaintiffs' injuries. Rejecting the defendants' contention that any · error inherent in that portion of the charge was rendered harmless by the numerous other sections of the charge that instructed the jury that the defendants' negligence need not be the sole cause of the injuries if it concurred with other efficient causes to bring them about, the *Ellis* court wrote:

> The challenged instruction bore upon a sensitive and decisive issue in the case. Regardless of how well intentioned the jury may have been, it had no way of knowing which of the two versions represented the correct rule.

---

counsel for plaintiffs made a timely objection to the jury charge at trial, an issue that would affect the standard of review in a plenary appeal.

> In charging the correct rule the trial judge neither withdrew those portions of the charge which required plaintiffs to establish that defendants' negligence was *the* proximate cause of their injuries nor stated the correct rule with such completeness as to counteract the erroneous one.
>
> . . . .
>
> We are satisfied that the challenged instruction, considered in connection with the other parts of the charge to which reference has been made above, requires reversal of the judgment.
>
> [*Id.* at 549–50, 233 *A.*2d 654 (citations and quotation omitted).]

■ Defendants remind this Court that we are obligated, as is any reviewing court, to evaluate the charge in its entirety and that, if the charge as a whole adequately presents the law and would not tend to confuse or mislead the jury, the fact that a particular expression, standing alone, may be said to be erroneous does not afford grounds for reversal. *Stackenwalt v. Washburn*, 42 *N.J.* 15, 26–27, 198 *A.*2d 454 (1964). We agree with the Appellate Division that an express statement by the trial court that its original charge was incorrect may have salvaged this charge but that absent such an express statement, the trial court's decision to grant a new trial should stand. In a departure from custom, the jury took the written charge into the jury room during its deliberations. Conscientious jurors may have fastened their attention on the uncorrected portion of the charge and believed themselves bound by its literal terms that forbade a verdict for plaintiffs if the intervening default and bankruptcy of Longview were deemed a proximate cause of plaintiffs' losses. Having determined that a new trial is required, we now turn our attention to the nature and scope of the retrial.

### III

There are three issues concerning the nature and scope of the retrial: (1) whether the first jury's finding that defendants had failed properly to inform plaintiffs of the risks of subordination should be binding on a jury at retrial; (2) whether the jury should consider plaintiffs' conduct as contributory negligence that might limit or bar their recovery; and (3) whether the standard for

assessing professional malpractice in the context of advice concerning commercial or financial risks undertaken by a client should include the doctrine of informed consent derived from medical malpractice.

 There are two aspects of the problem concerning the binding effect of the first jury's finding on the attorneys' malpractice, one is abstract, the other concrete. The abstract question is whether the erroneous jury instruction on proximate cause undermines confidence in the remainder of the verdict. In *DeRobertis v. Randazzo*, 94 *N.J.* 144, 160, 462 *A.*2d 1260 (1983), this Court held that a jury's finding of monetary damages would have to be retried because there was an erroneous jury instruction on liability. Should a jury's finding of fact on an aspect of negligence be treated otherwise? A jury verdict in a civil tort claim ordinarily consists of two components, a finding of negligent conduct and a finding of damages proximately caused by that conduct. Negligence, then, is usually inextricably intertwined with the concept of proximate cause. Thus, in *Tobia v. Cooper Hospital University Medical Center*, 136 *N.J.* 335, 643 *A.*2d 1 (1994), we found that an incorrect jury charge on contributory negligence tainted a jury verdict of no negligence on the part of the professional defendants. We said: "[T]he erroneous charge may have affected those verdicts [with respect to defendants] by improperly focusing the jury's attention on plaintiff's conduct, thus distracting the jury from the key question of whether defendants had been negligent." 136 *N.J.* at 343, 643 *A.*2d 1. So too here, the jury's finding of fault on the part of professional defendants may have been tempered by its understanding that the finding would not result in the imposition of any damages.

In *Ahn v. Kim*, 145 *N.J.* 377, 434, 678 *A.*2d 1051 (decided July 18, 1996), (slip op. at 14), also decided today, we note "the general rule that issues in negligence cases are to be retried together unless it clearly and convincingly appears that the issue unaffected by error is 'entirely distinct and separable' from the other issues." Although the jury's finding of negligence in the within case very

well may have been unaffected by error, we have no way of knowing precisely what conduct the jury based that finding on. Thus we cannot say that the jury's finding of negligence was entirely distinct and separable from the issue of proximate cause. In *Williams v. James*, 113 *N.J.* 619, 552 *A.*2d 153 (1989), we explained the difference between the concepts of a special verdict and a general verdict, the former being " 'a device for returning the facts only—leaving the legal consequences to the judge.' " *Id.* at 631, 552 *A.*2d 153 (quoting *Schabe v. Hampton Bays Union Free School Dist.*, 103 *A.D.*2d 418, 480 *N.Y.S.*2d 328, 334 (2nd Dept.1984)). "[T]he focus of a special verdict is the 'resolution of specific factual questions,' whereas the focus of a general verdict is to determine the outcome of the case." *Ibid.* (quoting *Schabe, supra*, 480 *N.Y.S.*2d at 334).

The concrete question is what precisely were the jury's factual findings and how would those findings relate to the issues of causation. For example, the attorneys' negligence may have consisted in giving no explanation of subordination at all (plaintiffs' basic theory), an incomplete explanation (one witness said that Kemph told one of the plaintiffs that subordination means that the bank gets paid first), or an unartful explanation couched in legal jargon rather than in the plain language necessary to impart its meaning to lay clients (a theory of one of the experts). How then might the court at retrial pose the issue to the jury? We foresee too many problems of repeat error if the terse language of the jury findings is translated into background circumstances that may or may not have been what the first jury intended to convey.

Because the jury's factual findings concerning the fault of the attorneys did not determine the outcome of the case and because those findings were imprecise, we direct that the retrial embrace those questions of fault on the part of the attorneys relating to the adequacy of their advice to plaintiffs concerning subordination and the risks associated with subordination. We leave undisturbed the determination of the lower courts that there need not be a retrial

of the defendants' duty to consult directly with certain individual partners.

We agree with the Appellate Division that the jury should not be permitted to consider plaintiffs' conduct as contributory negligence. In a long series of cases, we have explained that when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client. *See Cowan v. Doering*, 111 *N.J.* 451, 468, 545 *A.*2d 159 (1988) ("Because [defendants'] duty of care included the prevention of the kind of self-damaging acts that caused plaintiff's injuries, the plaintiff's actions and capacity were subsumed within the defendants' scope of duty. Thus, . . . the defense of contributory negligence was not available."). The reason is that the patient's conduct relates to causation rather than duty.

In *Theobald v. Byers*, 193 *Cal.App.*2d 147, 13 *Cal.Rptr.* 864 (1961), the attorneys did not inform the clients that they had to perfect by filing a mortgage that the attorneys had prepared for a loan that the clients were making to a third-party debtor. The clients sued for malpractice when the mortgage later failed as a secured claim in the debtor's bankruptcy proceeding. The attorneys argued that the clients' failure to inquire whether they needed to record the mortgage constituted contributory negligence, barring plaintiffs' claim. The *Theobald* court reversed the trial court's judgment in favor of the attorneys, finding that although the doctrine of contributory negligence could be applied to bar recovery in some cases (as when a client disregards the advice of an attorney), it was inapplicable to the facts presented in that case. *Id.* 13 *Cal.Rptr.* at 867. It reasoned that it would not be fair to hold the clients contributorily negligent

solely because of their failure to themselves perform the very acts for which they employed [the attorneys]. Such a result cannot be upheld. Clearly the value of an attorney's services in connection with a transaction of this nature consists largely of [the attorney's] superior knowledge of the necessary legal formalities which must be fulfilled in order for a document to be valid in the eyes of the law.

*[Id. 13 Cal.Rptr. at 866–67.]*

On the other hand, if a client or patient deliberately violates the professional's instructions with respect to self-care or heedlessly enters a transaction regardless of any instructions on the part of the professional, the trier of fact may find that there is no causal connection between the fault and the harm, *Lamb v. Barbour*, 188 *N.J.Super.* 6, 12–13, 455 *A.2d* 1122 (App.Div.1982) ("[N]owhere in the findings or the evidence ... is there anything to warrant a finding of proximate cause. Most conspicuous is the absence of testimony by either of the plaintiffs as to any circumstances reasonably to be hypothesized under which they could have been dissuaded from completing the transaction."), *cert. denied*, 93 *N.J.* 297, 460 *A.2d* 693 (1983), or that the plaintiff failed to mitigate her damages as she should have, *e.g.*, *Ostrowski v. Azzara*, 111 *N.J.* 429, 445, 545 *A.2d* 148 (1988). Plaintiffs' expert agreed that an attorney has no obligation "to lie down in front of a speeding train" to prevent a bad deal. In any event, the analysis is that of causation, not contributory negligence.

Malpractice in furnishing legal advice is a function of the specific situation and the known predilections of the client. An attorney in a counselling situation must advise a client of the risks of the transaction in terms sufficiently clear to enable the client to assess the client's risks. The care must be commensurate with the risks of the undertaking and tailored to the needs and sophistication of the client.

Defendants complain that this ruling encourages a client to act as a "potted plant" throughout the counseling, not asking questions about any matters that the client may not understand. Experience tells us, however, that most clients will not hesitate to ask questions when they have sufficient understanding to know that there is something about which they should be concerned.

The final issue is the standard for negligence in legal malpractice cases in which inadequate or inaccurate counselling is alleged as a concurrent cause of harm. As noted, the Appellate

Division opinion would incorporate into legal malpractice the objective and subjective standards of informed consent that have developed in the field of medical malpractice. *See generally Perna v. Pirozzi*, 92 *N.J.* 446, 457 *A.*2d 431 (1983) (discussing doctrine of informed consent in medical malpractice context). Those concepts of consent, drawn from the autonomy over one's body, seem strained in the context of commercial business transactions. Recall that the consent involved in medical malpractice usually relates to the invasion of a patient's body. It is a battery if a physician operates without the patient's consent; it is negligence if the physician operates without the patient's informed consent. The difference that we see is that in many instances the business client, unlike the medical patient, is not sick when the client consults an attorney. The business client is often motivated to enter into a legal transaction for many more reasons than a medical patient and may be at no risk at all at the inception of the transaction. Moreover, while most patients will not appreciate the risks of medical treatments absent an explanation by a doctor, many clients may understand as well as their attorney, if not better, the risks of a commercial business transaction.

The objective theory of informed consent, under which the jury would be asked to consider whether a reasonably prudent client would have entered into a business transaction if adequately informed of its attendant risks, fails to reflect the many highly subjective, personal, financial and strategic concerns that underlay most legal decisions and that are not present in the majority of medical decisions. A majority of medical patients are sick and consult a doctor for a single purpose—to get well. The patients usually bring little or no personal knowledge to the evaluation of the risks associated with their recovery.

Without any insight into the make-up and needs of the legal malpractice plaintiff, expert testimony regarding what a reasonably prudent client would have done under similar circumstances in weighing the risks and complications of complex commercial business transactions appears of dubious value to the trier of fact.

(Would a client wish not to be presented as a prudent person?) Clients such as Donald Trump or Harry Helmsley might view such matters differently than family farmers or business people or real estate developers. Defendants' expert acknowledged that the measure of the attorney's advice "depends on the expertise of the individual [client] involved."

In short, some clients may sufficiently understand aspects of a financial transaction, such as the priority of mortgages, so as not to impose a duty on their lawyer to explain the transaction in detail. For them, what a prudent client might do is largely irrelevant. On the other hand, each would probably approach by-pass surgery with a single similar purpose—to get well.

Because of its own concerns for the reliability of the concept of objective informed consent as the measure of causation in attorney malpractice cases, the Appellate Division would allow a subjective factor to be added to the analysis of informed consent when prior consistent statements corroborate a plaintiff's trial testimony. That analysis asks the jury not only whether a reasonable client in plaintiff's shoes would have entered into the transaction if adequately informed of its risks, but also whether the client in the case would have entered into the transaction if adequately informed of its risks. In *Largey v. Rothman*, 110 *N.J.* 204, 540 *A.*2d 504 (1988), we set forth our reasons for rejecting the subjective standard of informed consent in the medical malpractice context. We stated:

> [The subjective standard] places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient witness shadowed by the occurrence of the undisclosed risk.
>
> [*Id.* at 216, 540 *A.*2d 504 (citing *Canterbury v. Spence*, 464 *F.*2d 772, 790–91 (D.C.Cir.), *cert. denied*, 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972)).]

Although the Appellate Division's requirement of corroboration reduces the potential for evaluations of attorney malpractice based on hindsight, we find no persuasive need to introduce into attorney malpractice the subjective standard of informed consent that we

rejected in *Largey*. That is not to say that a legal malpractice claimant's testimony concerning whether he or she would have entered into a transaction, if adequately informed of its risks, is irrelevant. A client's attitude about risk is a part of that client and is a component of proximate cause. *Compare Profit Sharing Trust v. Lampf,* 267 *N.J.Super.* 174, 193, 630 *A.2d* 1191 (Law Div.1993) (holding that assumed legal malpractice was proximate cause of damages when plaintiffs specifically testified that had they been adequately or accurately informed of risks of commercial business transaction they would not have entered into transaction) *with Lamb v. Barbour, supra,* 188 *N.J.Super.* at 12–13, 455 *A.2d* 1122 (holding that assumed legal malpractice was not proximately connected to claim of damages when plaintiff offered no testimony "as to any circumstances reasonably to be hypothesized under which [plaintiff] could have been dissuaded from completing the transaction.").

 Rather than importing the doctrine of informed consent into attorney malpractice, we hold, as do most jurisdictions, that the usual principles of negligence apply to legal malpractice. "The requisite elements of a cause of action for legal malpractice are: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation." *Lovett v. Estate of Lovett,* 250 *N.J.Super.* 79, 87, 593 *A.2d* 382 (Ch.Div.1991).

 Although it sounds simple, " 'causation' is an inscrutably vague notion, susceptible to endless philosophical argument, as well as practical manipulation." Glen O. Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases,* 68 *Va. L. Rev.* 713, 713 (1982). Dean Prosser observed almost fifty years ago that " 'Proximate cause remains a tangle and a jungle, a palace of mirrors and a maze ... [it] covers a multitude of sins ... [and] is a complex term of highly uncertain meaning under which other

rules, doctrines and reasons lie buried.' " [5] *Mitchell v. Gonzales,* 54 *Cal.*3d 1041, 1 *Cal.Rptr.*2d 913, 917, 819 *P.*2d 872, 876 (1991) (quoting William L. Prosser, *Proximate Cause in California,* 38 *Cal. L.Rev.* 369, 375 (1950)).

▇▇▇ The first and most basic concept "buried" within proximate cause is that of causation in fact. Cause in fact is sometimes referred to as "but for" causation. In the routine tort case, "the law requires proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant." *Vuocolo v. Diamond Shamrock Chemicals Co.,* 240 *N.J.Super.* 289, 295, 573 *A.*2d 196 (App.Div.) (quoting *Evers v. Dollinger,* 95 *N.J.* 399, 415, 471 *A.*2d 405 (1984)), *certif. denied,* 122 *N.J.* 333, 585 *A.*2d 349 (1990). The simplest understanding of cause in fact in attorney malpractice cases arises from the case-within-a-case concept. For example, if a lawyer misses a statute of limitations and a complaint is dismissed for that reason, a plaintiff must still establish that had the action been timely filed it would have resulted in a favorable recovery. Laura Callaway Hart et al., *From Offense To Defense: Defending Legal Malpractice Claims,* 45 *S.C. L.Rev.* 771, 775 (1994).

Those cases present the easier aspects of causation. More complex are cases in which the attorney's negligent conduct combines with other causes that lead to the client's injury. In *Kelly v. Gwinnell,* 96 *N.J.* 538, 543, 476 *A.*2d 1219 (1984), we spoke of negligence that "creates" a risk of intervening harm. The host who serves alcohol to a visibly intoxicated guest creates the risk of harm ultimately caused by the drunken driver-guest. *Id.* at 543,

---

[5] We have been candid in New Jersey to view this doctrine not so much as an expression of the mechanics of causation, but as an expression of line-drawing by courts and juries, an instrument of "overall fairness and sound public policy." *Brown v. United States Stove Co.,* 98 *N.J.* 155, 173, 484 *A.*2d 1234 (1984). Juries, like courts, should understand the doctrine to be based on " 'logic, common sense, justice, policy and precedent.' " *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 78, 222 *A.*2d 513 (1966) (quoting *Powers v. Standard Oil Co.,* 98 *N.J.L.* 730, 734, 119 *A.* 273 (Sup.Ct.), *aff'd,* 98 *N.J.L.* 893, 121 *A.* 926 (E. & A.1923)).

548, 476 *A.*2d 1219. The negligent attorney, however, often does not "create" the risk of intervening harm (the attorney does not make the borrower more likely to become insolvent), but rather fails to take the steps that competent counsel should take to protect a client from the risks that ultimately produce the injury. *See, e.g., Picco v. Fords Diner, Inc.,* 113 *N.J.Super.* 465, 467, 274 *A.*2d 301 (App.Div.1971) (holding that jury question existed concerning whether diner operator's failure to provide lighting for parking area behind diner might be considered negligence that proximately caused criminal assault against infant patron of diner in parking lot at night).

The Conklins' theory is not that defendants directly caused or produced the insolvency of Longview, or even increased its risk, but rather that defendants failed to provide the Conklins with a sufficient understanding of subordination to enable them to protect themselves from the risks associated with subordination.

This lack of a causal relationship between defendants' failure to inform plaintiffs about the risks of subordination and the borrower's insolvency that caused plaintiffs' subsequent losses prompted the Appellate Division to find that the standard jury charge on proximate cause, even apart from the defective portions discussed above, was ill-suited for the situation. Traditionally, proximate cause has been defined "as being any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Fernandez v. Baruch,* 96 *N.J.Super.* 125, 140, 232 *A.*2d 661 (App.Div.1967), *rev'd on other grounds,* 52 *N.J.* 127, 244 *A.*2d 109 (1968). Similarly, the jury charge below stated that, to be a proximate cause of plaintiffs' losses, defendants' negligence had to be "an efficient cause of the plaintiffs' losses, *a cause which necessarily set the other causes in motion* and was a substantial factor in bringing about the plaintiffs' losses." (Emphasis added.) The problem with this language is that defendants' failure to inform plaintiffs about the risks of subordination did not in any sense "set in motion" the chain of

events that led to the bankruptcy of Longview Estates, the other primary cause of plaintiffs' losses.

Language concerning the "cause that sets the other causes in motion" relates to the concept of cause in fact, not to the value driven aspects of proximate cause. Such language does not aid the trier of fact when there are concurrent causes of harm that are neither set in motion nor increased by the other. The Supreme Court of California has disapproved, in cases involving "independent causes," the standard proximate cause definition in favor of the "sufficiently intelligible" substantial factor test. *Mitchell v. Gonzales,* 54 *Cal.*3d 1041, 1 *Cal.Rptr.*2d 913, 919–20, 819 *P.*2d 872, 878 (1991). It reasoned that "[the standard jury charge on proximate cause as a continuous sequence is] conceptually and grammatically deficient. The deficiencies may mislead jurors, causing them ... to focus improperly on the cause that is spatially or temporally closest to the harm." [6] *Ibid.*

Generally, our concepts of causation for failure to act are expressed in terms of whether the negligent conduct may be considered a substantial factor contributing to the loss. *See Brown v. United States Stove Co.,* 98 *N.J.* 155, 171, 484 *A.*2d 1234 (1984) ("With respect to concurrent proximate causation, a tortfeasor will be held answerable if its 'negligent conduct was a substantial factor in bringing about the injuries,' even where there are 'other intervening causes which were foreseeable or were normal incidents of the risk created.' ") (quoting *Rappaport v. Nichols,* 31 *N.J.* 188, 202, 156 *A.*2d 1 (1959)). Although the law of negligence recognizes that there may be any number of concurrent causes of an injury, "[n]evertheless, these acts need not, of themselves, be capable of producing the injury; it is enough if they are a

---

[6] The California Supreme Court disapproved, in that context, a proximate cause charge that provided: "A proximate cause of ... harm, is a cause which, in the natural and continuous sequence, produces the ... harm, and without which the ... harm would not have occurred." *Id.* 1 *Cal.Rptr.*2d at 914 n. 2, 819 *P.*2d at 873 n. 2.

'substantial factor' in bringing it about." *Scott v. Salem County Memorial Hosp.*, 116 *N.J.Super.* 29, 33–34, 280 *A.*2d 843 (App.Div. 1971).[7]

The substantial factor test accounts for the fact that there can be any number of intervening causes between the initial wrongful act and the final injurious consequence and does not require an unsevered connecting link between the negligent conduct and the ultimate harm. The test is thus suited for legal malpractice cases in which inadequate or inaccurate legal advice is alleged to be a concurrent cause of harm. To relate the concepts to the facts, a court might instruct the jury to consider whether a reasonably competent transactional lawyer would have advised the clients of the economic risks that they took and whether the lack of the benefit of that advice was a substantial factor in causing them harm. Application of the test will guard against the concerns expressed by the Appellate Division concerning the jury charge in this case.

Finally, the defendant and the *amicus curiae*, New Jersey State Bar Association, contend that the Appellate Division has imposed on attorneys a duty to warn of unforeseeable risks. In its opinion, the Appellate Division stated: "As an attorney, defendant had a legal duty to explain to plaintiffs the meaning of a subordination agreement and to alert them of its risks, *reasonably foreseeable or not.*" 281 *N.J.Super.* at 454–55, 658 *A.*2d 322 (emphasis added). What the Appellate Division was really saying is that foreseeability is a red herring in a case like this. The risk was as plain as any can be—if the buyers defaulted or became insolvent, the Conklins' subordinated mortgage would become worthless. Defendants' expert agreed that, although an attorney need not "spell

---

[7] The Model Jury Charges presently recommended for use in New Jersey do not include a model charge specifically tailored to failure to act cases. There is a suggested charge for evaluation of intervening causes but no charge indicating that the standard charge on sequential causation not be given in such cases. Our Committee on Model Jury Charges, Civil, may wish to consider any needed changes.

out for the client" all the possible "scenarios" of loss, the attorney's "statement [to the client] should be [that] if [the purchaser] does not pay for whatever reason, whatever the cause, you are at risk."

The Appellate Division was thus concerned that it would be unfair to require the Conklins to prove that the specific events leading to their losses (the bankruptcy of and default by Longview Estates) were foreseeable at the time of sale. *See id.* at 454, 658 *A.*2d 322. The court remarked that "[t]here is a distinction between whether defendant's conduct caused the foreclosure and bankruptcies, and whether it caused plaintiffs' losses resulting from those events." *Ibid.* However, "[i]f conduct creates an unreasonable risk of foreseeable harm, it matters not that the precise injury which occurred was not foreseen. If it is within the realm of foreseeability that some harm might result, negligence may be found." *Koenig v. General Foods Corp.*, 168 *N.J.Super.* 368, 373, 403 *A.*2d 36 (App.Div.1979); *Chomatopoulos v. Roma DeNotte Social Club*, 212 *N.J.Super.* 447, 453, 515 *A.*2d 296 (Law Div.1985). Thus, although it may not have been foreseeable that the Longview parties would become insolvent, the consequences of insolvency were always plainly foreseeable.

A client who engages an attorney to structure a deal without a "risk quotient" is entitled to services commensurate with that understanding or at least to be informed of the risks involved. Obviously no attorney is a guarantor of the future and would not be expected, for example, to advise a client that the United States government might default on its bonds if that were the form of collateral given to the client.

In reality, there is usually no such thing as a risk-free deal. The best that a lawyer can do is to control the risks to help the clients to achieve their financial objectives. The sale of a house has risks—that the buyer will die (normally one the seller doesn't worry about), that the buyers will not sell their home (one that the sellers usually refuse to accept and the buyer usually bears), that the buyers may not obtain a mortgage (one the parties control

through the terms of the commitment clause). Through advice and negotiating the terms of the contract, the parties and their lawyers control the risks of the deal. The Conklins wanted a specific price—twelve million dollars. They made a poor deal and sustained a grave loss. The question is whether the lack of adequate advice was a substantial factor in causing the Conklins' exposure to an unwanted risk of harm.

## IV

To summarize, we agree with the courts below that the jury charge on proximate cause could have confused the jury and led to an unjust result and that plaintiffs are entitled, under *Rule* 4:49, to a new trial. The retrial will be much less complex than the first trial, which involved many more issues and theories of negligence and even more parties. We hold that the retrial must include the issue of defendants' negligence but not plaintiffs' comparative negligence. Further, we find that the objective and subjective tests for informed consent, borrowed from the medical malpractice context, are unsuited for legal malpractice cases in which inadequate or inaccurate advice is alleged as a concurrent cause of harm. Rather, we hold that usual principles of negligence apply, including an analysis of foreseeability. We hold, however, that the traditional jury charge on proximate cause as a continuous sequence is inapt for legal malpractice cases in which there are concurrent independent causes of harm and that a jury in such cases must be instructed to determine whether the negligence was a substantial factor in bringing about the ultimate harm.

As modified, the judgment of the Appellate Division is affirmed.

*For modification and affirmance*— Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.