**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1889-24

JUAN MANUEL ARCE
CALYECA,

     Plaintiff-Appellant,

v.

HYUNYOON JUNG and
CALI CARTING, INC.

     Defendants,

and

GALAXY TOWERS
CONDOMINIUM ASSOCIATION,

     Defendant-Respondent.

_____

Argued May 18, 2026 – Decided June 3, 2026

Before Judges Sabatino, Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-7795-19.

Joseph A. Reardon, III, argued the cause for appellant (Ginarte Gonzalez Winograd, LLP, attorneys; Joseph A. Reardon III, of counsel and on the brief; Robert J. Ciampaglio, Jr., on the briefs).

Danielle M. DeGeorgio argued the cause for respondent (Tyson & Mendes LLP, attorneys; Danielle M. DeGeorgio, on the briefs).

PER CURIAM

Plaintiff, a trash collector, was struck by a car and severely injured in the course of unloading a dumpster he had wheeled to the street from a tower within defendant's large-scale condominium complex. The complex had induced plaintiff's employer to change the designated location where the trash for that tower had to be unloaded, moving the spot from a previous, safer location.

In this lawsuit, plaintiff contended the complex had negligently taken part in creating a highly dangerous condition that was a proximate cause of the collision and his injuries. The motion judge granted summary judgment to the complex, ruling that it owed plaintiff no legal duty and that there were no genuine issues of material fact. Plaintiff appeals that ruling.

Having applied to these distinctive circumstances, the general principles of legal duty set forth in Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993), and viewing the record in a light most favorable to plaintiff, we vacate the summary judgment order and remand for a jury trial.

2

A-1889-24

I.

Galaxy Towers and its Trash Pickup Arrangements

Defendant, Galaxy Towers Condominium Association ("Galaxy"), and its members own a large complex known as Galaxy Towers in Guttenberg. The complex contains three residential towers, two connecting buildings, and a commercial space called Galaxy Mall. Galaxy Towers consists of 1,075 residential condominiums spread across the three towers and two connecting buildings. The residents of Galaxy Towers comprise approximately one-third of the entire population of the Township of Guttenberg.

Co-defendant, Cali Carting, Inc. ("Cali Carting")[1] is a solid waste and recycling company. Since 2003, Cali Carting has been awarded successive three-year contracts with the Township to collect all the municipality's solid waste. These contracts encompassed the waste generated at Galaxy Towers, where employees from Cali Carting would collect trash from the Towers six times per week.[2] According to the deposition of Cali Carting's president, John

---

[1] Although Cali Carting is named as a defendant, this was only for the purposes of streamlining discovery; plaintiff has recovered benefits from Cali Carting through worker's compensation as an exclusive remedy against his employer. See N.J.S.A. 34:15-8.

[2] By comparison, Cali Carting would collect waste from the rest of the Township only twice per week.

A-1889-24

Cali, the written contract with the Township did not specify the manner in which Cali Carting was required to collect waste from Galaxy Towers.

When Cali Carting first began collecting trash in 2003, there were only two pickup locations at the Towers. For both of those locations, Tower One and Tower Three, Cali Carting employees could park the garbage truck within the complex, specifically at a loading dock in the complex for Tower Three. However, according to Cali, in 2019 Galaxy induced Cali Carting to add a third pickup spot at Tower Two because there was "some kind of equipment issue" that resulted in Galaxy no longer being able to transport the dumpsters from Tower Two to the pickup location at Tower Three. Cali clarified this change was made because the forklift Galaxy had used to transport the dumpsters from Tower Two to Tower Three was broken.

To effectuate the change, Cali and his company's night shift supervisor, Ed Matos, met with a Galaxy representative to review the pickup process at the new additional location. The Galaxy representative showed Cali and Matos the room where the dumpsters would be stored and gave them a key to access that room. Although Cali did not recall an explicit discussion as to where the garbage truck would need to be parked while the trash was collected at Tower Two, it was "understood" that there was no room for the truck on the sidewalk.

4

Consequently, the truck would have to be parked on the public street, specifically River Road[3], while the trash was collected.

As defendant has stressed in this case, a transfer of the trash to the truck on the street was not unusual. According to Cali, "[n]inety-five percent of [Cali Carting's] collection occurs in the public street . . . there is only a very limited amount of our pickups that are done on private property."

It was Cali's "general assumption at the meeting" that when picking up trash at Tower Two, Cali Carting employees "would use [their] general company safety protocols." He saw no need to detail to Galaxy how the trash would be collected.

According to Galaxy's general manager, William Flemm, Galaxy would ensure that the dumpsters were placed in the interior room at the Tower Two location. Employees from Cali Carting would move the dumpsters out onto River Road, where the truck was parked in the right turning lane, to unload the waste.

In the rooms where the dumpsters were stored at each of the towers, Galaxy provided three orange reflective cones for Cali Carting employees to

---

[3] River Road at that location is a four-lane thoroughfare, with a speed limit of thirty-five miles per hour. The road has no shoulders at the pickup spot but does have a third right-hand turning lane there.

A-1889-24

place behind their truck. The cones were "the normal" height for traffic cones, roughly one meter tall, and they would usually be arranged at the back of the truck "like a triangle." On the night of the collision, the furthest cone from the truck was placed approximately ten meters behind the truck. The rear of the trucks used by Cali Carting had amber strobe lights along with stationary red lights, which were operating at the time of the accident.

### Plaintiff's Role in the Pickup and May 2, 2019, Collision

Several months after the addition of Tower Two as a pickup spot, plaintiff, Juan Manuel Arce Calyeca, was part of a three-man team collecting trash on the overnight shift from 10:00 p.m. to 10:00 a.m. Plaintiff had been an employee of Cali Carting since 2014. He stated that aside from being trained on how to safely lift dumpsters, he was not provided with any traffic safety training from his employer. Although Cali Carting provided plaintiff with an orange reflective vest, he was not provided with flashlights or any other traffic safety equipment.

Plaintiff's role on the team was a "loader." He did not drive the truck but was responsible for emptying dumpsters and trash cans into the back of the truck and moving the containers back to the curb.

On May 2, 2019, a few months after Cali Carting began collecting from Tower Two, plaintiff was accompanied by another loader, who was a temporary

6

employee from an outside agency, and a driver, Miguel Nolasco. After leaving the facility where Cali Carting kept the trucks, Galaxy Towers was the first stop on the crew's night-time route, beginning with Tower One. According to plaintiff, that first stop took fifteen to twenty minutes to complete. At the next stop, Tower Three, the crew spent twenty-five minutes unloading trash. Hence, by the time the crew went to pick up the trash at Tower Two, they would have been on the premises for forty to forty-five minutes.

To collect trash at the final stop, Tower Two, Nolasco parked the truck in the right-hand lane of River Road next to the room where the waste was stored. At the time he was struck, plaintiff had finished unloading a container into the crew's truck and was pulling it backwards towards the sidewalk, facing towards the truck and away from any oncoming traffic.

Plaintiff did not hear any screeching tires or see any headlights approaching. Nolasco was inside the trash collection room of Tower Two moving a glass table with the temporary employee when he heard the sound of a car crash.

Security footage from the trash room in Tower Two shows Nolasco and the temporary employee moving a glass table, with plaintiff in the background moving a dumpster. Several seconds into the video, plaintiff is shown being

A-1889-24

struck by a car and pinned against the dumpster. The two other employees in the trash room immediately dropped the table and ran to assist him.

As the video depicts, it is evident that the driver of the car, co-defendant Hyunyoon Jung, made no attempt to slow down. According to Jung, she "saw nothing at all" in the right-hand lane of River Road and did not see the truck or plaintiff before the collision.

Shortly after the accident, police arrived and noted plaintiff was "bleeding profusely from both of his legs, which appeared to be nearly severed from the knee." Jung was uninjured. Plaintiff was given medical aid at the scene before being transported to Hackensack Hospital.

Injuries and Complaint

Plaintiff suffered severe injuries from the crash, most notably an amputation of his left leg above the knee. He also suffered numerous fractures in his right leg and a fracture of his spine, which required surgical correction and resulted in scarring.[4]

In November 2019, plaintiff filed a complaint for negligence in the Law Division against Jung and Galaxy, along with fictitious parties. He amended the

---

[4] The record indicates plaintiff's medical expenses as of January 2023 exceeded $1.2 million dollars.

complaint in June 2021 to include Cali Carting as a defendant, solely for the purposes of discovery.

Galaxy's Summary Judgment Motion and Plaintiff's Motion for Reconsideration

In April 2022, Galaxy moved for summary judgment. Primarily, Galaxy argued that discovery had not shown any control over the public roadway on River Road or how the trash would be collected and, therefore, it did not owe a duty to plaintiff. Galaxy asserted that Cali Carting was responsible for "the matter, means and method of pickup." Galaxy also urged against creating a precedent that would make homeowners responsible for the injuries of trash collectors or mail carriers who operate in the public roads.

In reply, plaintiff contrasted Galaxy Towers from "Mr. and Mrs. Jones taking a few items out to the curb", underscoring the large number of Guttenberg residents who reside in the Towers. Plaintiff stressed that, unlike every other residential premises in the Township, Galaxy Towers required trash collection services six days a week. Plaintiff also stressed that this collection took up to forty-five minutes to complete. During that lengthy time, Cali Carting employees were exposed to the public road. Plaintiff argued the length of time it took to collect trash was in Galaxy's control, because it chose to store its dumpsters in an interior room that they had to be moved from in order to be

9

emptied into an exterior parked truck.

Jung likewise opposed Galaxy's motion. She noted that Galaxy provided the dumpsters. They were not fitted with any reflecting tape to aid drivers in being able to spot them, which signified "they were intended to be used at an off-roadway location."

The motion judge granted summary judgment to Galaxy. The judge reasoned that Galaxy had not created a dangerous condition on its premises and was not in control of the manner in which Cali Carting collected trash from Tower Two. The judge noted Cali's deposition testimony that "ninety-five percent" of Cali Carting's work is performed on public roads. The judge also agreed with Galaxy's public policy concerns that, under plaintiff's theory, any homeowner could be made liable for a third party striking a municipal employee in the street in front of their residence.

Plaintiff moved for reconsideration. At that oral argument, plaintiff attempted to ease the court's policy concerns by again pointing to the distinctive size of the Galaxy complex and the amount of trash it generated as compared to the average citizen. Plaintiff asserted that, unlike an average homeowner who may occasionally have a lot of trash, Galaxy Towers required an extensive pickup procedure all the time.

10

The trial court remained unconvinced of plaintiff's arguments and denied reconsideration. Plaintiff attempted to appeal at that point, but we declined jurisdiction because plaintiff still had open claims against co-defendant Jung.

Jung's Accident Reconstruction Expert

After Galaxy's dismissal, the lawsuit proceeded with Jung as the sole defendant. Jung presented an expert report of an accident reconstructionist. With regard to Galaxy, the expert noted that designating the pickup spot at Tower Two meant it was impossible for Cali Carting to park the truck out of the roadway while collecting trash. The expert opined that the establishment of a "loading area which necessitates personnel are operating in a travel way" reflects "a disregard for the risks inherent with completing loading operations on the road." To avoid this risk, Galaxy should have "transported the dumpsters to other pickup locations, off the roadways," such as Towers One and Three. In addition, the expert asserted that Cali Carting's crew should have placed warning devices such as cones and flares at ten, 100 and 200 feet away from the back of the truck. He opined that either Galaxy or Cali Carting should have established a "temporary traffic control area" with cones and flashing lights.

After being served with the expert report, plaintiff moved for the trial court to reconsider Galaxy's dismissal from the case in light of that report. The

court denied that application, generally reiterating its earlier reasons for finding that Galaxy did not have a duty to protect plaintiff while he was working in the street.

Dismissal of Jung and the Present Appeal

In March 2024, plaintiff and Jung entered into a consent order that stipulated Jung would pay him $100,000, the amount of her insurance policy limits. However, the consent order was conditioned upon our court rejecting an appeal of Galaxy's dismissal. Due to the conditional nature of the consent order, we dismissed the appeal without prejudice, because the appeal was still interlocutory.

Thereafter, in November 2024, Jung and plaintiff entered into a new consent order that stipulated Jung would pay him the policy limits with no conditions. Jung, along with Cali Carting, were accordingly dismissed from the case with prejudice. This appeal by plaintiff followed.

Before us, plaintiff argues the trial court erred in concluding that Galaxy owed no legal duty to plaintiff for the injuries he sustained in the crash in the public roadway adjacent to its premises. Plaintiff contends that Galaxy insinuated itself into the methods used to pick up trash from Tower Two, and that it was a substantial causal factor in creating the dangerous condition.

12

Plaintiff further notes that case law has recognized some instances in which a landowner may be liable for accidents occurring off its premises.

Further, plaintiff submits that imposing liability on Galaxy would not offend public policy, given its massive size, the frequency and length of time it took to collect its garbage, and other distinctive facts that distinguish Galaxy from an average homeowner.

II.

The pivotal question before us is whether Galaxy could owe plaintiff, a garbage collector, a legal duty with respect to his safety in removing trash from its premises and unloading it onto a garbage truck parked, apparently by necessity, on the adjacent public street. We review that question of law de novo. Qian v. Toll Bros., Inc., 223 N.J. 124, 135 (2015). As we do so, we consider the record presented on summary judgment in a light most favorable to plaintiff as the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995).

In the domain of negligence law, New Jersey courts have been guided by a multifactor test in ascertaining whether a legal duty of care should be imposed under the common law. The Supreme Court expressed that multifactor test in its seminal opinion in Hopkins, 132 N.J. at 439. The inquiry involves a weighing

13

of: (1) "the relationship of the parties"; (2) "the nature of the attendant risk"; (3) "the opportunity and ability to exercise care"; and (4) "the public interest in the proposed solution." Ibid.; see also Est. of Narleski v. Gomes, 244 N.J. 199, 223-27 (2020) (recognizing a defendant's duty of care in an auto accident case upon applying these four criteria).

Before we analyze the four Hopkins factors, we must dispel the premise that Galaxy cannot owe a duty to plaintiff because he was injured outside the perimeter of Galaxy's property. It is undisputed that plaintiff and his crew of trash collectors were moving dumpsters back and forth from inside the "interior room" within Tower Two to the adjacent street where the sanitation truck was parked. There is a close and repetitive nexus of movement on and off the property.

Case law has recognized that landowners may, at times, owe a duty to persons who come to their property but are foreseeably injured in nearby locations. For example, in Nielsen v. Wal-Mart Store No. 2171, 429 N.J. Super. 251, 265 (App. Div. 2013), we held that a property owner owed a duty to a contractor who slipped on loose gravel on the outside perimeter owned by the site's developer. The plaintiff was an exterminator who fell on the perimeter of a Wal-Mart store while in the process of providing services there. Id. at 254-

14

The Wal-Mart owned only a unit in a larger commercial plot, and according to the master deed was not contractually responsible for maintaining the exterior area, which was owned by the developer.  Ibid.  Even so, we held the Wal-Mart owed a duty of care because the store was "well-known to the plaintiff" and the plaintiff was specifically present to exterminate pests for its benefit.  Id. at 261.  Furthermore, Wal-Mart had directed the plaintiff to perform his work outside of the perimeter of the store, rather than moving through the interior, meaning it had placed him at risk of encountering a dangerous condition, loose sand and gravel, without any warning.  Id. at 263.

Here, plaintiff argues that Galaxy comparably was familiar with—and benefited from—the garbage crews who came to service their complex six times each week.  According to plaintiff's interpretation of the events, Galaxy was the catalyst that ended the safer previous means of Tower Two trash pickup from within the premises, and which caused Cali Carting to have to upload the dumpsters on the adjacent public street.

We have also recognized a landowner's duty in a context in which a plaintiff was harmed by a third-party driver on a nearby public street. See Mulraney v. Aueltto's Catering Nat. Valet Parking Servs., 293 N.J. Super. 315, 318 (App. Div. 1996).  Mulraney concerned a pedestrian who was struck and

A-1889-24

killed by a car after she had parked across the highway from a venue. Ibid. The venue had been aware that for particularly busy events, patrons often parked across the highway and had even put up signage on some of these occasions, but not the occasion when the pedestrian was killed. Id. at 318-19. We concluded that because the venue was aware of the dangerous condition and had "the ability to illuminate an area where pedestrians are likely to cross and/or provide warnings," it was "fair and just" to impose a duty on the venue to mitigate against this risk. Id. at 322. We deemed particularly important to our analysis, the fact that the venue had "created" the dangerous condition "by its own business operation" in hosting large events with the knowledge that some guests would have to park "on the opposite side of a poorly illuminated county highway that had no crossing for pedestrians." Id. at 323.

By comparison, we reached an opposite conclusion in Brierly v. Rode, 396 N.J. Super. 52, 57 (App. Div. 2007), which we decided after Mulraney. We declined in Brierly to impose a duty of care on a defendant business that knew patrons of a tavern across the street would use its parking lot outside of business hours, after a patron of the tavern had been struck by a car crossing the street. Ibid. We noted in Brierly that tavern patrons had used the defendant business's parking while it was closed, signifying that the defendant was "far less able to

16

assess or ameliorate the specific hazards" created by the tavern's operations. Ibid.

On this record, we are satisfied that the trial court analytically erred in placing such strong emphasis on the fact that plaintiff was struck and injured while standing on a public street, steps away from the ingress and egress to Tower Two. There is a sufficient nexus for a duty to be imposed in the circumstances presented, which are more akin to the circumstances in Nielsen and Mulraney and less comparable to Brierly.

That said, we proceed to discuss the four Hopkins factors as they may bear upon to this case. We do so subject to the amplified or clarifying evidence that may emerge at trial, and which may affect the ultimate duty analysis. Based on the present record, the four factors collectively support the recognition of a duty owed by Galaxy to plaintiff in the distinctive circumstances involved here.

1. The relationship of the parties. As we have pointed out, plaintiff and his fellow trash collection crew members were frequently on the premises, as many as six times per week. It took the crews forty or more minutes to collect the refuse from the dumpsters in all three towers. They were present to provide a service of considerable benefits, including but not limited to sanitation benefits, to Galaxy and its residents. We need not classify whether plaintiff was

an "invitee" or whether some other term better describes his status in routinely coming to and from the premises and spending many work hours there. Hopkins, 132 N.J. at 438 (eschewing rigid categorical classifications such as invitees and licensees).

Moreover, Galaxy initiated the change of pickup location, and it supplied Cali Carting with the traffic cones that were used as (what proved to be inadequate) a means of traffic control. See, e,g., Sanna v. Nat'l Sponge Co., 209 N.J. Super. 60, 68-69 (App. Div. 1986) (in which the landowner's provision of equipment used by the plaintiff to create a scaffold was a factor in imposing a duty).

In recognizing a potential duty of care owed by Galaxy, we are mindful of the role of plaintiff's employer—who he cannot sue in tort—as arguably being in a position to reduce the chances of a motor vehicle collision on River Road with one of its workers while unloading a dumpster from Tower Two. For instance, the employer might have deployed brighter and bigger warning signs, used a flagman to divert traffic, or arranged police protection from the Township while the unloading from that tower was taking place. But the possibility of such measures does not eliminate a claim that Galaxy was a concurrent and substantial cause, if not the main one, in endangering plaintiff. See Conklin v.

A-1889-24

Hannoch Weisman, 145 N.J. 395, 417 (1996) (addressing situations in which a defendant's negligent conduct combines with other causes that lead to a plaintiff's injury or harm); Camp v. Jiffy Lube No. 114, 309 N.J. Super. 305, 309 (App. Div. 1998) (same); see also Model (Civil) Jury Charge, 6.12 "Proximate Cause – Where there is Claim That Concurrent Causes of Harm Were Present" (Rev. Nov. 2023).

2. The nature of the attendant risk. The risks of severe injury in wheeling dumpsters from the designated room out to River Road (a busy street), and back are considerable. The risk was increased substantially when Galaxy declared that the trash from Tower Two could no longer be picked up at the previous safer location.

3. The opportunity and ability to exercise care. Viewing the record in a light most favorable to plaintiff, there appear to be several plausible ways in which Galaxy might have been able to reduce the risk of ham. The most effective of these means, of course, was for Galaxy to allow the former means of trash pickup to continue. Beyond that, Galaxy might have provided Cali Carting with better equipment such as dumpsters with reflective tape, larger traffic cones than the three provided, or other measures such as an illuminated

19

sign or an employee holding a flag.[5]  We recognize that plaintiff's employer would have the primary responsibility to make the means of pickup safer.  But Galaxy arguably had an important role as well, particularly in eliminating the former, safer method of removing Tower Two refuse.

4. <u>The public interest in the proposed solution</u>.  We respectfully part company with the trial court on this factor.  We acknowledge that our case law has declined, by analogy, in sidewalk liability cases to impose high duties of care on residential homeowners with regard to maintaining public sidewalks adjacent to their premises.  <u>Stewart v. 104 Wallace Street, Inc.</u>, 87 N.J. 146, 159 (1981); <u>Padilla v. Young Il An</u>, 257 N.J. 540, 562-63 (2024).  Although Galaxy Towers is a mixed-use property with both residential units and businesses, the dominant use of the property is residential.  <u>See</u> <u>Luchejko v. City of Hoboken</u>, 207 N.J. 191, 211 (2011) (treating a mixed-use condominium project as residential for sidewalk liability purposes).

Nonetheless, the imposition of a duty of care on Galaxy in the distinctive circumstances presented here would not have to extend such a duty to average

---

[5]  Out of fairness to Galaxy, we do not rely on any of the safety suggestions identified by Jung's accident reconstruction expert.  By the time his report was tendered to the trial court, Galaxy had already been dismissed from the case and had no opportunity to depose the expert or counter his opinions.

homeowners.    As noted above, Galaxy has over 1,000 units, over 3,000 residents, and comprises about one-third of the Township's population.    Its dimensions along with the frequency and duration of trash pickup are unlike that of the average homeowner.  The recognition of a duty here could be confined to this particular and unique setting, and finding such a duty could help prevent future injuries.

In sum, the trial court's summary judgment order must be vacated, and its categorical rejection of a duty reversed.  The contours of a duty can be finalized in the jury charge in light of the actual evidence adduced at trial.

Vacated in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1889-24